**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI CIVIL DIVISION**

**Case No. 1:12-cv-22282-WJZ**
Honorable Judge William J. Zloch

KARLA VANESSA ARCIA, an individual,
MELANDE ANTOINE, an individual, VEYE
YO, a civic organization based in Miami-
Dade County, FLORIDA IMMIGRANT
COALITION, INC., a Florida non-profit
corporation, NATIONAL CONGRESS FOR
PUERTO RICAN RIGHTS, a Pennsylvania
non-profit corporation, FLORIDA NEW
MAJORITY, INC., a Florida non-profit
corporation, and 1199SEIU UNITED
HEALTHCARE WORKERS EAST, a Labor
Union,

                Plaintiffs,

                 v.

KEN DETZNER, in his official capacity as
Florida Secretary of State,

                Defendant.

## FIRST AMENDED COMPLAINT

    Plaintiffs KARLA VANESSA ARCIA, an individual; MELANDE ANTOINE, an individual; VEYE YO, a civic organization based in Miami-Dade County; FLORIDA IMMIGRANT COALITION, INC., a Florida non-profit corporation; NATIONAL CONGRESS FOR PUERTO RICAN RIGHTS, a Pennsylvania non-profit corporation; FLORIDA NEW MAJORITY, INC., a Florida not for profit corporation; and 1199SEIU UNITED HEALTHCARE WORKERS EAST, a labor union (collectively "Plaintiffs"), bring this action seeking a declaratory judgment and injunctive relief against Defendant KEN DETZNER, in his official capacity as Florida Secretary of State ("Defendant"), and aver as follows:

## NATURE OF THE CASE

1.      Plaintiffs are individuals and organizations whose rights and the rights of their members are affected by the program instituted by the Florida Department of State ("DOS") to carry out a systematic purge of alleged non-citizens from the Florida voter rolls.

2.      In April 2012, DOS initiated a program known as "Processing Ineligible Registered Voters – Non-Immigrants" (the "Program to Purge Alleged Non-Citizens").  DOS had, to date, collected a list containing more than 180,000 names of alleged 'potential non-citizens' (the "180,000-person list").  To initiate the Program to Purge Alleged Non-Citizens, DOS sent a sample of the 180,000-person list, containing approximately 2,625 names (the "Initial Purge List"), to Florida's Supervisors of Elections.  DOS further provided Florida Supervisors of Elections with direction as to how to review and use this list to determine the eligibility of currently-registered voters.  In particular, DOS instructed Supervisors of Elections to review existing voter files and further conduct additional research using "whatever other sources [Supervisors of Elections] have to confirm identity and potential change in legal status." DOS further instructed that, once a Supervisor of Elections found "information credible and reliable" to support the determination that a registered voter was a non-citizen, they should initiate notice of this conclusion, first via certified mail and second via publication, if necessary. Several Supervisors of Elections began implementing this program by sending notices containing allegations of non-citizenship, and some Supervisors of Elections actually purged voters from the registration rolls.

3.      Following press reports exposing the shockingly low accuracy rate of the Initial Purge List and demands from the United States Department of Justice and private litigants that Florida cease its purge efforts, DOS temporarily suspended the Program to Purge Alleged Non-Citizens, but also announced that it intended to continue the purge later using a different method.

In particular, Defendant announced that DOS was awaiting a determination from the United States Department of Homeland Security ("DHS") regarding the State's requested access to DHS's Systematic Alien Verification for Entitlements ("SAVE") database.  DOS stated that, if granted access to the SAVE database, it would use the information contained in that database to continue its Program to Purge Alleged Non-Citizens.  DOS admitted that its own information was outdated, and without the information provided by SAVE, individuals who are naturalized citizens but who were included on the Initial Purge List would be inconvenienced, and potentially even incorrectly purged from the voter rolls and unable to vote in Florida's upcoming Federal elections.

4.      On information and belief, Defendant received word from DHS on July 9, 2012, that Florida would have access to the SAVE database following the entry of a Memorandum of Agreement ("MOA") between DOS and DHS.  DOS and DHS executed an MOA on August 14, 2012, thus DOS's resumption of the purge is imminent.

5.      The Program to Purge Alleged Non-Citizens, both as initially established and as currently planned, violates Section 8(c)(2)(A) of the NVRA, 42 U.S.C. § 1973gg-6(c)(2)(A), which prohibits the systematic purging of eligible voters from the official voter list for the State of Florida within 90 days before the date of a primary or general election for Federal office. Plaintiffs additionally seek a preliminary and permanent injunction ordering Defendant to discontinue the Program to Purge Alleged Non-Citizens given this violation of the NVRA.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as a case arising under the laws of the United States; and under 28 U.S.C. § 1343(a)(4), as a case seeking equitable and other relief pursuant to an act of Congress providing for the protection of the right to vote.  In light of Florida's history of engaging in

actions that have compromised its citizens' fundamental right to vote, and due to the likelihood that the State will continue to take steps to cause irreparable harm to valid and legitimate voters by illegally purging them, it is imperative that this Court hear and consider this action and grant injunctive relief.

7.      Section 11(b) of the NVRA, 42 U.S.C. § 1973gg-9(b), creates a private right of action for parties who are aggrieved by a violation of the Act.

8.      Venue is proper in this District because a substantial portion of the violations and harms complained of herein occurred, or will occur, in this District.

## PARTIES

9.      Plaintiff KARLA VANESSA ARCIA[1] ("Ms. Arcia") is an individual and a resident of Miami-Dade County, Florida.  Ms. Arcia is a citizen of the United States of America and a qualified and legally registered Florida voter.  Ms. Arcia is Nicaraguan-American.  As set forth more fully below, Ms. Arcia's rights have been, and will continue to be, adversely affected by the Program to Purge Alleged Non-Citizens.

10.      Plaintiff MELANDE ANTOINE ("Mrs. Antoine") is an individual and a resident of Miami-Dade County, Florida.  Mrs. Antoine is a citizen of the United States of America and a qualified and legally registered Florida voter.  Mrs. Antoine is Haitian-American.  As set forth more fully below, Mrs. Antoine's rights have been, and will continue to be, adversely affected by the Program to Purge Alleged Non-Citizens.

---

[1] Plaintiffs Arcia and Antoine may at times be referred to collectively as the "Individual Plaintiffs."

11.     Plaintiff VEYE YO[2] ("VEYE YO"), is a Miami-Dade County-based civic organization that is affiliated with the Haitian-American Grassroots Coalition.  It has an office in Miami-Dade County, Florida, and individual members throughout South Florida.  VEYE YO's primary purposes are to empower Haitian-American citizens who are engaged in civic and democratic endeavors, and to assist members of the Haitian-American community in identifying and articulating issues of concern, including voting rights issues.  VEYE YO is an organization dedicated to increasing the prominence and participation of Haitian-Americans in every aspect of the political process.  To achieve this goal, VEYE YO facilitates naturalization classes, registers voters and engages in voter education and voter mobilization efforts.  Defendant's unlawful practices have frustrated VEYE YO's mission as VEYE YO has been required to expend resources to locate members who have been unlawfully purged or who received letters questioning their eligibility to vote, to educate its members about Defendant's unlawful practices and to combat them at the expense of its regularly-conducted programs/activities.  Moreover, VEYE YO has individual members who have been adversely affected by the Program to Purge Alleged Non-Citizens.

12.     Plaintiff FLORIDA IMMIGRANT COALITION, INC. ("FLIC"), is a Florida non-profit corporation with its principal office in Miami-Dade County, Florida, and with member organizations located throughout the State of Florida.  Central to FLIC's stated mission is the integration of immigrants into the civic and cultural life of America's communities.  In conjunction with the National Partnership for New Americans, in early 2012, FLIC launched "Florida New Americans," an initiative aimed at providing opportunities for the full integration

---

[2] Plaintiffs Veye Yo; Florida Immigrant Coalition, Inc.; National Congress for Puerto Rican Rights; Florida New Majority, Inc.; and 1199SEIU United Healthcare Workers East may at times be referred to collectively as the "Organizational Plaintiffs."

of Florida's largest immigrant communities, through a citizenship program that includes citizenship clinics and naturalization classes, all with the goal of advancing immigrant rights and creating active citizenship among new Americans to achieve a vibrant, just, and welcoming democracy for all.  Defendant's unlawful practices have frustrated FLIC's mission and have forced it to divert its scarce resources to combat Defendant's unlawful practices at the expense of its regularly-conducted programs/activities.

13.    Plaintiff the NATIONAL CONGRESS FOR PUERTO RICAN RIGHTS ("NCPRR") is a Pennsylvania non-profit corporation and membership organization founded in 1981 and dedicated to securing full equality for Puerto Ricans living in the United States through advocacy, education and participation in the political process.  NCPRR has chapters across the United States, including Central and Southern Florida.  These chapters are actively involved in safeguarding Puerto Rican and Hispanic voting rights and ensuring the political access of Puerto Ricans and Haitian Americans in Florida.  NCPRR's members are mainly comprised of Puerto Ricans and other Hispanics who are concerned about civic participation, including voting rights. NCPRR's Florida members stand to be disenfranchised by Defendant's unlawful practices, which include inaccurate name matching that has already resulted in native-born United States citizens being targeted based on improper discriminatory factors.  NCPRR's mission is frustrated by Defendant's unlawful voter-purge practices, and NCPRR has had to divert resources to combat Defendant's unlawful practices.

14.    Plaintiff FLORIDA NEW MAJORITY, INC. ("FNM"), is a Florida non-profit corporation and membership organization with its principal office in Miami-Dade County, Florida.   Founded in 2009, FNM is dedicated to organizing, educating, and mobilizing disempowered communities in Florida to win equity and fairness throughout the State.  FNM's

central focus is to expand democracy and develop the leadership of underrepresented communities.  To achieve its goal, FNM works with citizens who are engaged in civic and democratic endeavors and assists members of its target communities in identifying and articulating issues of concern, including voting rights issues.  Defendant's unlawful practices have frustrated FNM's mission. FNM has been required to expend resources (1) to locate members who have been unlawfully purged and/or (2) to educate its members about Defendant's unlawful practices in order to combat them, at the expense of its regularly-conducted programs/activities.  FNM has individual members who have been affected by the Program to Purge Alleged Non-Citizens.

15.     Plaintiff 1199SEIU UNITED HEALTHCARE WORKERS EAST ("1199SEIU") is a labor union that represents 25,000 healthcare workers, as well as an additional 7,400 retired members, in the State of Florida.  1199SEIU has members in 43 out of the 67 counties in Florida, including, but not limited to, the counties in this District, as well as Collier, Lee, Hillsborough, and Hendry Counties.  Many of 1199SEIU's members are registered to vote or have sought to register to vote.  1199SEIU has devoted significant time, energy and resources to making sure its members and their families, co-workers, and community members are registered to vote, and is committed to ensuring that every Floridian who is a United States citizen has the right to vote and the opportunity to exercise that right.  Voter registration, education, and engagement are central to 1199SEIU's mission, as reflected in its financial and personnel commitments and in the Service Employee International Union's mission statement:   "We must build political power to ensure that workers' voices are heard at every level of government to create economic opportunity and foster social justice."  Some of 1199SEIU's members, including Ms. Arcia and Mrs. Antoine, are United States citizens who were adversely affected by the Program to Purge

Alleged Non-Citizens.  Defendant's unlawful practices frustrate 1199SEIU's mission and require it to expend its limited resources investigating and taking measures to counteract the Program to Purge Alleged Non-Citizens, thus diverting resources from its planned voter registration and education activities.

16.     Defendant KEN DETZNER is the Secretary of State for the State of Florida, and is being sued in his official capacity.  Pursuant to Fla. Stat. § 92.012, Florida's Secretary of State is the chief elections officer of the State and is therefore responsible for administration of state laws that affect voting, and for ensuring that elections in Florida are conducted according to law. Additionally, he is responsible for coordinating Florida's duties and responsibilities under the NVRA.

## STATEMENT OF FACTS AND LAW

**I.      The State of Florida's Program to Purge Alleged Non-Citizens**

17.     In a press release dated May 9, 2012 (the "Press Release"), Defendant announced that the DOS was partnering with the Florida Department of Highway Safety and Motor Vehicles ("DHSMV") "to identify non-citizens who are currently on Florida's voter rolls."  In the Press Release, Defendant asserted that the new initiative "is already proving to be successful.  DOS sent the information of more than 2,600 potential non-citizens to Florida's 67 Supervisors of Elections for review and, if warranted, removal from Florida's voter rolls."

18.     According to the Press Release, the Program to Purge Alleged Non-Citizens arose after the DOS and DHSMV began working together to develop a way to identify non-citizens in early 2011 following "a credentialing project led by DHSMV which informed DOS of the potential to identify non-citizens in DHSMV's database, which requires anyone getting a new driver's license or renewing a driver's license or state ID card to submit documentary proof of his or her legal status."  The Press Release further alleged that:

When DOS receives information from DHSMV indicating that a registered voter may not be a United States citizen, DOS conducts an initial investigation to determine whether the information identifying a voter as potentially ineligible is credible and reliable. This preliminary investigation includes a cross-reference of all files against the Comprehensive Case Information System, DHSMV, Department of Corrections, Florida Parole Commission and Immigration and Customs Enforcement (ICE) *databases* in order to assist supervisors of elections in the removal process by providing the most accurate documentation available. Additionally, DOS is actively seeking access to federal Department of Homeland Security databases such as SAVE (Systematic Alien Verification for Entitlements) for further verification of immigration status.

**A.      The Initial Purge List**

19.      On or about April 2, 2012, Defendant sent approximately 2,625 names, with accompanying identifying information for persons whom Defendant claimed were potential non-citizens, to each of the Supervisors of Elections in Florida's 67 counties including the Supervisors of Elections for Palm Beach, Broward, Miami-Dade and Monroe Counties.   The Initial Purge List included columns with each person's name, date of birth, voter identification number and a column titled "LAST DHSMV TRANSACTION," purporting to set forth each person's last DHSMV visit.

20.      Thereafter, in mid-April of 2012, Defendant published a Webinar (the "Webinar") directing the Supervisors of Elections to review the file information provided on the Initial Purge List and "conduct any additional research" (the "Additional Research"), described as follows:

Refer to whatever other sources you have to confirm identity and potential change in legal status.  You should all have access to DHSMV's DAVE [the Driver and Vehicle Express System].  *If you find information credible and reliable, proceed*.

(Emphasis added).

21.      After completing the Additional Research, the Supervisors of Elections were instructed by Defendant to carry out the procedures of Fla. Stat. § 98.075(7), for the removal of

voters from the voter rolls. This directive was consistent with information contained in the Press Release, wherein Defendant stated as follows:

> When a supervisor of elections receives information from DOS that a registered voter is a potential non-citizen, *the supervisor must begin the statutory notice and removal process*.

(Emphasis added). The Webinar further advised Supervisors of Elections that they "have authority to investigate and refer fraudulent registrations or illegal voting to the state attorney's office."

22. The Webinar stated that persons had been placed on the Initial Purge List as a result of positive identification that had been made by matching three out of five fields in the DHSMV database, including first name, last name, and birth date (for example "John" and "Smith" and a specific date of birth). This matching system was severely flawed and, as several media reports have indicated, resulted in naturalized citizens and citizens *born in the United States* ending up on the Initial Purge List, including a World War II veteran, who was born in Brooklyn, New York, and a woman of Puerto Rican descent who was born in New York City. In fact, the Webinar as much as acknowledged the serious flaws in the system, indicating as it did that the Federal REAL ID law requiring proof of immigration status at the time of securing a driver's license or state identification has not yet been fully implemented in Florida, illustrating that changes in legal immigration status, including naturalization, would not necessarily be included in the DHSMV database.

23. As set forth more fully below, the processes and procedures used by the Supervisors of Elections to verify the eligibility of persons on the Initial Purge List and to deal with the individuals the Supervisors of Elections determined to be possibly ineligible varied widely – including one county that refused to implement the Program to Purge Alleged Non-Citizens because of the inaccuracy of the Initial Purge List and at least two counties that not only

implemented the Program to Purge Alleged Non-Citizens, but removed persons who did not respond to the notice and/or did not return the voter eligibility form.

24.    The content of the letter sent by individual Florida Supervisors of Elections varied as well.  For example, the form letter sent by Jennifer J. Edwards, Supervisor of Elections for Collier County, dated May 11, 2012, stated that to avoid removal, the recipient must bring to Supervisor Edwards' office the enclosed voter eligibility form, along with an original of any documentation demonstrating citizenship.  The template notice letter provided in connection with the Webinar stated that a copy of any documentation could be mailed or faxed to the relevant Supervisor's office.

25.    The Initial Purge List proved to be inaccurate, obsolete, and an insufficient basis for challenging voters.  On April 30, 2012, DOS suspended the Program to Purge Alleged Non-Citizens due to its inaccuracies.  DOS asserted it would resume the program once it received access to DHS's SAVE database, claiming such access would allow the State to improve the accuracy of its Program to Purge Alleged Non-Citizens.  But the program had already caused – and continues to cause – ongoing damage both to those who received letters informing them that they were suspected to be non-citizens and that such persons needed to come forward with evidence of citizenship to prevent them from being removed from the voter rolls, as well as to those who were actually removed from the rolls.  Defendant's planned resumption of the program will cause further injury to Plaintiffs and Florida voters and violates federal law as explained herein.

26.    Pursuant to 42 U.S.C. § 1973gg-9(b), where, as here, a State is alleged to have committed acts in violation of the NVRA within 120 days of a Federal election, the statute requires that the State receive notice of that violation at least 20 days prior to the commencement

of a civil lawsuit.  By letter dated May 24, 2012, Plaintiffs' counsel provided Defendant with written *ante litem* notice that the Program to Purge Alleged Non-Citizens was in violation of the NVRA.

        **B.**      **Resumption of the Program to Purge Alleged Non-Citizens**

27.     On August 14, 2012, Defendant Secretary of State Ken Detzner stated that Florida would purge the state voter registry using its access to the SAVE database prior to the November 2012 general election.  Since the general election day is November 6, 2012, Defendant's planned purge of the state voter registry will occur within ninety (90) days of a Federal election.

28.     DHS had communicated to the Department of State on or around July 9, 2012, that it would grant DOS access to SAVE, conditioned on the negotiation and execution of an MOA that would outline the appropriate uses of the database.  In a letter dated July 14, 2012, Defendant Detzner indicated that, upon execution of the MOA, state staff would be trained on how to access the SAVE database in order to attempt to verify the legal status of individuals alleged to be non-citizens.  Defendant Detzner asserted that the State would use the SAVE database to check the Initial Purge List, the results of which would be passed along to Florida's Supervisors of Elections for "additional actions."

29.     The SAVE database is a compilation of databases that contains information on legal immigrants who are issued green cards or visas, as well as those who become naturalized citizens.  The SAVE database was not designed for the purpose of verifying voter eligibility.

30.     DOS and DHS executed the MOA on August 14, 2012, at which point Defendant announced his intention to resume the Program to Purge Alleged Non-Citizens.

31.     In resuming the Program to Purge Alleged Non-Citizens, Defendant stated that he will rely upon the DHSMV registry to compile a potential list of non-citizens, apparently similar to the way the DOS initially compiled the flawed lists of 2,625 and 180,000 individuals, and

from there, will run that list against the SAVE database.  After checking the DHSMV list against the SAVE database, Defendant's spokesman Chris Cates stated that Florida will "continue to seek out names of non-citizens…."  *Florida Moves Forward with Voter Purge After Feds Grant Access to Database*, WFSU Aug. 16, 2012, http://news.wfsu.org/post/ florida-moves-forward-voter-purge-after-feds-grant-access-database.

32.    On information and belief, training for resumption of the Program to Purge Alleged Non-Citizens has already begun in at least one county (in September 2012).  *See Collier to Begin Reviewing Potential Illegal Voters*, WZVN Sept. 6, 2012, http://www.abc-7.com/story/19476766/collier-county-to-begin-reviewing-potential-illegal-voters#.UEpqdy_LY_Y.email.

33.    By letter dated August 3, 2012, Plaintiffs' counsel reiterated its written *ante litem* notice that the Program to Purge Alleged Non-Citizens was in violation of the NVRA. Additionally, Plaintiffs' counsel explained this violation to Defendant's counsel at both the July 23, 2012 status conference held by this Court and the parties' Federal Rule of Civil Procedure 26 meet and confer.  To date, the violation has not been corrected.  Instead, Defendant has made clear that he intends to go ahead with the Program to Purge Alleged Non-Citizens.

## II.    Implementation of the Program to Purge Alleged Non-Citizens Within 90 Days Prior to 2012 Federal Election Dates Violates the NVRA.

34.    Section 8(c)(2)(A) of the NVRA requires that the State of Florida "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters." 42 U.S.C. § 1973gg-6(c)(2)(A).

35.    The prohibition on systematic purges within 90 days of a federal election is central to the NVRA's goals of protecting against possible disenfranchisement of eligible voters

while ensuring accurate and current voter registration rolls.  The House Report on the NVRA articulated the concerns underlying the policy against programs that systematically remove ineligible voters from the official list of eligible voters, noting that "***such programs can be abused and may result in the elimination of names of voters from the rolls solely due to their failure to respond to a mailing.  Abuses may be found in the design of a program as well as in its implementation.***" House Report No. 103-9, H.R. REP. 103-9, 15-16, 1993 U.S.C.C.A.N. 105, 119-20 (emphasis added).  As Congress acknowledged, it is difficult for voters to identify and correct the errors of a systematic purge in the short 90-day time frame, and it is difficult for election officials to execute and implement such a systematic program properly in such a short time frame.  A system-wide purge generates system-wide confusion that renders it less likely that election officials will have the time necessary to correct erroneous removals.  Section 8(c)(2)(B) protects voters and election officials alike from an inevitably error-riddled purge done too close to an election by prohibiting states from conducting "any program the purpose of which is to systematically remove the names of ineligible voters" within the 90-day period.

36.    The unequivocal language of this provision bans any and every systematic program other than the removals specifically exempted.   The NVRA establishes clear, enumerated exceptions to the 90-day prohibition.   A state may only remove from the list registered persons who fall into one of four categories:  those who request to be removed, those ineligible because of criminal conviction, those ineligible because of mental incapacity, and those who have died.   42 U.S.C. § 1973gg-(6)(c)(2)(B).   The NVRA accomplishes this by placing outside the prohibition's ambit the categories of removals enumerated in 42 U.S.C. § 1973gg-(6)(c)(3)(A) and (B) or (4)(A) and (B).

37.     Importantly, the removal of alleged non-citizen voters is not one of the enumerated exceptions to the NVRA's 90-day prohibition.  During the debates on the NVRA, Senator Mitch McConnell proposed an amendment that would have expanded the exceptions to the proscription against removal of voters from the rolls during the 90-day period.  *See* 139 Cong. Rec. 2960 (Mar. 16, 1993) (Amendment No. 100); 139 Cong. Rec. 2970 (Amendment No. 141), and 139 Cong. Rec. 3066 (Mar. 17, 1993) (Amendment No. 169).  *Cf.* 42 U.S.C. §1973gg-6(a)(3) (2010).  That amendment was not adopted.

38.     Such legislative history supports the previously delineated *expressio unius* argument that, "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied."  *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980).  Moreover, alternative measures are readily available to deal with any known instances of non-citizen voting.

39.     The primary election in Florida was held on August 14, 2012 and included federal offices.  Ninety (90) days before the August 14 primary election was May 16, 2012.  The Federal general election in Florida, as elsewhere, is November 6, 2012.  Ninety (90) days before the November 6 election was August 8, 2012.

40.     On information and belief, the majority of voters who were purged based on the Initial Purge List were removed after May 16, 2012, and thus were purged within 90 days of the primary election.  On information and belief, the majority of voters on the Initial Purge List who were notified of their purported need to prove they were citizens were instructed that their deadline to return the voter eligibility forms was after May 16, 2012.  Moreover, assuming that Defendant followed the requirements of Section 48.075(7), Florida Statutes, no voter on the Initial Purge List could possibly have been removed in accordance with those procedures until

15

after May 16, 2012.   By that time, had these procedures been followed, such removal would have necessarily violated the NVRA because it would had to have taken place after May 16, 2012.

41.     Defendant's plan to continue the Program to Purge Alleged Non-Citizens will result in systematic removal of additional voters within 90 days of the general election.  At this point, there are fewer than 90 days before the November 6, 2012 Federal election.  Accordingly, any notification sent to voters after May 16, 2012, including future notices based on the SAVE databases, stating that the State has flagged them as potentially ineligible based on the SAVE database will, at this point, violate the NVRA.

42.     Defendant has not disputed the timelines set forth above.  However, despite the NVRA's ban on systematic purges within the 90 days prior to an election, as set forth above, Defendant instructed the Supervisors of Elections to continue to carry out the Program to Purge Alleged Non-Citizens, as it was initially construed, by reviewing the Initial Purge List within 90 days of the primary, conducting Additional Research, sending out notices and voter eligibility forms, and removing voters under Fla. Stat. § 98.075(7).   Similarly, Defendant has stated publicly that he plans a systematic purge targeting additional voters based on use of the SAVE database within 90 days of the general election.

43.     Defendant has sought to excuse these actions by creating a new exception to Section 8(c)(2)(A) that allows removals of alleged noncitizens within the 90-day period.  Defendant is wrong.   As explained above, the provision prohibits "any program … to systematically remove" ineligible voters from the roll.  Removal of alleged non-citizen voters is not an enumerated exception to the NVRA's 90-day provision.

## COUNT I

### DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 AND SECTION 8(C)(2)(A) OF THE NVRA, 42 U.S.C. § 1973GG-6(C)(2)(A)

44.      Plaintiffs incorporate Paragraphs 1 through 43 above.

45.      This is an action for declaratory relief pursuant to the Declaratory Judgment Act. Plaintiffs seek a declaration that the Program to Purge Alleged Non-Citizens violates Section 8(c)(2)(A) of the NVRA, 42 U.S.C. § 1973gg-6(c)(2)(A), which bars systematic purges within 90 days of an election, except in limited and specific circumstances not found here.

46.      There is a *bona fide*, actual, present and practical need for the requested declaration.  The Program to Purge Alleged Non-Citizens deprives eligible voters, including Individual Plaintiffs, of their rights under the NVRA.  The Program to Purge Alleged Non-Citizens also disenfranchises voters within the communities that Organizational Plaintiffs serve and thus frustrates the missions of Organizational Plaintiffs.

47.      Defendant has repeatedly confirmed his intent to continue the Program to Purge Alleged Non-Citizens.

## COUNT II

### INJUNCTIVE RELIEF

48.      Plaintiffs incorporate Paragraphs 1 through 43 above.

49.      42 U.S.C. § 1973gg-9(b)(2), provides for injunctive relief to redress a violation of the NVRA.

50.      Plaintiffs have a strong likelihood of suffering irreparable and substantial harm as a result of the Program to Purge Alleged Non-Citizens.  Unless this Court enjoins Defendant's planned systematic removal of additional voters, more eligible voters will be removed from the rolls between now and the November election in violation of the NVRA.

51.     The public interest weighs strongly in favor of letting every lawful, eligible voter exercise the right to vote.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that the Court enter a judgment declaring that:

(a)     the Program to Purge Alleged Non-Citizens violates Section 8(c)(2)(A) of the NVRA, 42 U.S.C. § 1973gg-6(c)(2)(A), which bars systematic purges within 90 days of an election, except in limited and specific circumstances not found here;

**WHEREFORE**, Plaintiffs request that the Court enter a preliminary and a permanent injunction:

A.     declaring that the Program to Purge Alleged Non-Citizens, specifically including plans to remove additional voters based on use of the SAVE database, is a systematic purge within ninety (90) days of a Federal election and is therefore unlawful under the NVRA;

B.     enjoining the Defendant from implementing the Program to Purge Alleged Non-Citizens, specifically including plans to remove additional voters based on use of the SAVE database;

C.     prohibiting Defendant from enforcing standards, practices, procedures and/or programs that deny persons of color and members of language minority groups who are United States citizens an opportunity to participate effectively in the political process on an equal basis with other members of the electorate;

D.     filing with the Court, within five days of the issuance of an injunction, a list of voters removed pursuant to the Purge, and a report stating which voters have been reinstated and providing confirmation of the steps that Defendant is taking to comply with the injunction;

E.     granting such further relief as the needs and interests of justice require, including reasonable attorneys' fees, including litigation expenses and costs pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 1973gg-9(c).

Dated:  September 12, 2012                    Respectfully submitted,

                                             By:   /s/ John De Leon

John De Leon
Florida Bar No. 650390
**LAW OFFICES OF CHAVEZ & DE LEON**
5975 Sunset Drive, Suite 605
South Miami, FL 33143
(305) 740-5347
(305) 740-5348 (fax)
jdeleon@chavez-deleon.com

Of Counsel:

Catherine M. Flanagan
Michelle Kanter Cohen
**PROJECT VOTE**
1350 I St., N.W., Suite 1250
Washington, DC 20005
(202) 546-4173
(202) 629-3754 (fax)
cflanagan@projectvote.org
mkantercohen@projectvote.org

Lorelie S. Masters
Marc A. Goldman
**JENNER & BLOCK, LLP**
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001-4412
(202) 639-6000
(202) 639-6066 (fax)
lmasters@jenner.com
mgoldman@jenner.com

Ben Hovland
**FAIR ELECTIONS LEGAL NETWORK**
1825 K Street NW, Suite 450
Washington, DC 20006
(202) 248-5346
(202) 331-1663 (fax)
bhovland@fairelectionsnetwork.com

J. Gerald Hebert
Campaign Legal Center
215 E Street NE
Washington, DC 20002
(202) 736-2200
ghebert@campaignlegalcenter.org

Juan Cartagena
Jose Perez, Esq.
Diana Sen, Esq.
**LATINOJUSTICE PRLDEF**
99 Hudson Street, 14th Floor
New York, NY 10013-2815
(212) 219-3360
(212) 431-4276 (fax)
jcartagena@latinojustice.org
jperez@latinojustice.org
dsen@latinojustice.org

Katherine Roberson-Young, Esq.
Florida Bar No. 038169
3000 Biscayne Blvd., Suite 212
Miami, Florida 33137
(305) 571-4082
(305) 571-1396 (fax)
katherine.roberson-young@seiu.org

Penda Hair
Katherine Culliton-Gonzalez, Esq.
Uzoma Nkwonta, Esq.
**ADVANCEMENT PROJECT**
1220 L Street, N.W., Suite 850
Washington, D.C. 20005

(202) 728-9557
(202) 728-9558 (fax)
pendahair@advancementproject.org
kcullitongonzalez@advancementproject.org
unkwonta@advancementproject.org

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on September 12, 2012, a true and correct copy of the foregoing was served on all counsel of record via CM/ECF.

Dated: September 12, 2012       By:    /s/ John De Leon_____

                                       John De Leon