**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI CIVIL DIVISION**
Case No. 1:12-cv-22282-WJZ
Honorable Judge William J. Zloch

KARLA VANESSA ARCIA, an individual,
MELANDE ANTOINE, an individual, VEYE
YO, a civic organization based in Miami-
Dade County, FLORIDA IMMIGRANT
COALITION, INC., a Florida non-profit
corporation, NATIONAL CONGRESS FOR
PUERTO RICAN RIGHTS, a Pennsylvania
non-profit corporation, FLORIDA NEW
MAJORITY, INC., a Florida non-profit
corporation, and 1199SEIU UNITED
HEALTHCARE WORKERS EAST, a Labor
Union,

   Plaintiffs,

   v.

KEN DETZNER, in his official capacity as
Florida Secretary of State,

   Defendant.

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT**

  With fewer than 60 days until the November 6, 2012 federal elections, the Defendant,

Florida Secretary of State Ken Detzner, is beginning a systematic purge of Florida's voter rolls

with the goal of removing non-citizens.  Florida's Supervisors of Elections (SOEs) are just

starting to be trained to conduct the purge using a new database, and some SOEs have already

expressed concern that the purge will result in the removal of eligible voters from the rolls.  *See*

Ex. A (Decl. of Ion V. Sancho), ¶¶ 17-24; Josh Israel, *Florida Supervisors of Elections Speak*

*Out Against New Voter Purge* (Sept. 13, 2012), *at* thinkprogress.org/election/2012/…/florida-

supervisors-of-elections-speak-out-against-new-voter-purge (last accessed Sept. 19, 2012).  This

concern is well-founded; as Florida's past efforts to systematically remove ineligible voters

demonstrate, such programs will inevitably remove eligible voters as well.  *See infra* Part I.A.

And with so little time to ensure the accuracy of the purge and correct mistakes before November

6, some eligible voters will inevitably be denied their fundamental right to vote.

In the National Voter Registration Act of 1993 (NVRA), Congress recognized that

systematic programs to purge the voter rolls on the eve of a federal election threaten the rights of

eligible voters.  It thus prohibited "*any* program the purpose of which is to systematically remove

the names of ineligible voters from the official lists of eligible voters" fewer than "90 days prior

to the date of a primary or general election for Federal office."  42 U.S.C. § 1973gg-6(c)(2)(A)

(emphasis added).  The Defendant's attempt to "systematically remove the names of ineligible

voters" – non-citizens – fewer than 60 days before Election Day falls squarely within this

provision.  Accordingly, the Plaintiffs seek an injunction of the Defendant's planned purge and

prompt entry of summary judgment in their favor.  No other relief will vindicate Congress'

interest in ensuring that eligible voters can exercise their right to vote in the upcoming election.

# I.     FACTUAL AND STATUTORY BACKGROUND

### A.   Factual Background

Since 2000, Florida has made several attempts to systematically remove ineligible voters

from the rolls.  Each has been beset with problems.

Prior to the 2000 presidential election, the Florida Department of State contracted with a

third party vendor, Database Technologies Inc., to cross-check the names of the state's 8.6

million registered voters.  The voter list was checked against law enforcement and other records,

but the matching methods turned out to be flawed.  As a result, the Department of State

misidentified – and purged – thousands of legitimate registered voters.  See Ex. B (Declaration and Expert Report of Daniel A. Smith), ¶ 44.

Then, prior to the 2004 presidential election, the Florida Division of Elections attempted to purge roughly 48,000 voters whom it deemed ineligible because of felony conviction with discriminatory results.  It matched corrections records with voter registration lists, but failed to account for differences between the way the two databases categorized the race of Hispanic individuals.  As a result, very few records of Hispanic voters were "matched" based on race, and only 63 Hispanic voters were slated to be purged (in comparison to approximately 22,000 African-American voters).  Florida abandoned the purge after voting rights groups noted that the disparate treatment of African-Americans and Hispanics reflected the prevailing voting pattern of those groups in Florida.  *See* Ex. B (Smith Decl. and Rpt.), ¶ 45.

In 2011, Florida began contemplating a new systematic effort to remove ineligible voters from the voter rolls.  This time it targeted non-citizens, despite little evidence that non-citizens were on the rolls – let alone actually voting – and despite little evidence that SOEs were failing to prevent non-citizens from voting through existing procedures.  Indeed, at that time (and to this day) the NVRA and Florida law made it highly unlikely that there were significant numbers of non-citizens voting in U.S. elections.  To register to vote, an individual has to attest under penalty of perjury that he is a citizen.  *See* 42 U.S.C. § 1973gg-3(C)(2)(B)(ii), § 1973gg-3(C)(2)(C); F.S.A. § 97.052.  And if a non-citizen manages to circumvent that requirement, he still has to face the threat of felony prosecution and possible deportation to actually cast a vote. *See* 18 U.S.C. § 1015(f).

Nonetheless, to address the theoretical problem of voting by non-citizens, the Defendant's predecessor, Kurt Browning, created list after list of "potential non-citizens."  These

lists proved unreliable, and Browning therefore refused to implement the results.  Ex. B (Smith

Decl. and Rpt.), ¶ 44.  But the Defendant has chosen a different path.  In April 2012, just days

before the beginning of the NVRA's 90-day quiet period in relation to Florida's August 14

federal primary election, Secretary Detzner commenced the program for "Processing Ineligible

Registered Voters – Non-Immigrants" (the "Program to Purge Alleged Non-Citizens").  As part

of this April iteration of the Program, Defendant, through his agents, sent to Florida's 67 SOEs a

list of approximately 2,625 names, representing a supposed "sample" of a larger list of

approximately 180,000 "potential non-citizens" that Florida's Department of State (DOS) had

collected to that date.[1]  Defendant also provided the SOEs with directions on how to review and

use this list to determine the eligibility of currently-registered voters.  *See* Ex. A (Sancho Decl.),

¶¶ 5-8.  Several SOEs began implementing this program by sending notices containing

allegations of non-citizenship, and some SOEs actually purged voters from the registration rolls.

*See, e.g.*, Ex. B (Smith Decl. and Rpt.), ¶ 41.

　　　This April attempt quickly proved to be a failure; as one federal court put it, "[t]here were

major flaws in the program."  *United States v. Florida*, 2012 WL 2457506, *1 (N.D. Fla. June

28, 2012).  The court found that the Defendant "compiled the list [of non-citizens] in a manner

certain to include a large number of citizens."[2]  *Id.*  And the court concluded that the Defendant's

---

[1]  In fact, the origin of the lists remains uncertain.  Despite Defendant's claims that the list
sent to the SOEs represented a "sample" of the larger list, this is shown not to be the case.  Ex. B
(Smith Decl. and Rpt.), ¶¶ 21-36.  Expert analysis of the lists reveals that DOS's methodology in
preparing the lists has been severely flawed.  Moreover, questions remain as to exactly how DOS
created the initial list of 2,625 "potential non-citizens."  *Id.* at ¶¶ 34-35.

[2]  The President of the Florida State Association of Supervisors of Elections agreed,
stating that the SOEs "felt the information wasn't credible and reliable. . . . *Too many voters on
the state's list turned out to actually be citizens.*"  Ex. B (Smith Decl. and Rpt.), ¶ 39 (emphasis
added).

methodology was flawed in such a way that it was likely to discriminatorily disenfranchise new

citizens who were eligible to vote:

> The record indicates that the Secretary's program identified many properly
> registered citizens as potential noncitizens. Given the methodology, that is hardly
> surprising. The Secretary's proposal was to send letters to the listed individuals
> requiring a response and ultimately to require them to provide documentation of
> their citizenship. The Secretary's methodology made it likely that the properly
> registered citizens who would be required to respond and provide documentation
> would be primarily newly naturalized citizens. The program was likely to have a
> discriminatory impact on these new citizens. And while the Secretary suggests
> that having to respond to this kind of inquiry is of little import, that is not so. A
> state cannot properly impose burdensome demands in a discriminatory manner.

*United States v. Florida*, 2012 WL 2457506, at *4.

The Defendant eventually stopped his initial purge effort. *See e.g.*, Ex. B (Smith Decl.

and Rpt.), ¶ 41. But evidently, he did not learn the key lesson from that effort and the State's

prior efforts to purge ineligible voters: that systematic purges, particularly those conducted

hastily in proximity to an election, will inevitably deny *eligible* voters their voting rights.

On August 16, 2012, the Defendant set about implementing a new approach to the earlier

purge program. This time, he had the State enter into an agreement with the U.S. Department of

Homeland Security (DHS) that provides the State with access to DHS's Systematic Alien

Verification for Entitlements (SAVE) database.[3] The Defendant has said that the State will now

resume its systematic purge by using the SAVE database to check a list of "potential" non-

citizens it will compile in a manner that appears similar to the way DOS compiled the flawed

lists of 2,600 and 180,000 individuals. Ex. B (Smith Decl. and Rpt.), ¶ 42. SOEs who have

---

[3] The SAVE database is a compilation of databases that contains information on legal
immigrants who are issued green cards or visas, as well as those immigrants who have become
naturalized citizens. It includes unique numeric identifiers for those individuals, such as a
person's alien number or the number from a Certificate of Naturalization or Certificate of
Citizenship. But the SAVE database it is not a universal citizen database; many individuals,
including natural-born citizens, are not included in it. Ex. B (Smith Decl. and Rpt.), ¶ 42.

recently received training on Defendant's planned process have expressed serious concern about the inaccuracies inherent in implementing this process so close to Election Day.  *See, e.g.*, Ex. B (Sancho Decl. and Rpt.), ¶¶ 17-26.  Their concerns are justified.  The process the DOS used to create the list of potential non-citizens is methodologically flawed in several respects, *see* Ex. B (Smith Decl. and Rpt.), ¶¶ 20-34, and "may well result in a number of false positives, with legally registered voters wrongly purged from the voter rolls," *id.* ¶ 43.

B.  Statutory Background

Congress enacted the NVRA in 1993, spurred by the "declining numbers of voters who participate in Federal elections."  H.R. Rep. No. 103-9, at 5 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 105, 109.  Congress explicitly recognized that "the right of citizens of the United States to vote is a fundamental right"; that "it is the duty of the Federal, State, and local governments to promote the exercise of that right"; and that "discriminatory and unfair [voting] laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities."  42 U.S.C. § 1973gg(a).

Through the NVRA, Congress targeted legal obstacles that frustrated the voting process, whether they were "intentional or inadvertent."  S. Rep. No. 103-6 (1993).  While Congress recognized "the need for the State to maintain accurate voting rolls," it was also focused on the potential abuses in the design and implementation of programs to purge ineligible voters.  *Id.* The Senate Report accompanying the NVRA cautioned that the processes used to ensure the accuracy of the voting rolls:

> must be scrutinized to prevent poor and illiterate voters from being caught in a purge system which will require them to needlessly re-register.  Such processes must be structured to prevent abuse which has a disparate impact on minority communities.  Unfortunately, there is a long history of such list cleaning

mechanisms which have been used to violate the basic rights of citizens.

*Id.*; *see also* H.R. Rep. No. 103-9, at 106 (noting the history of "restrictive . . . administrative procedures" in federal elections intended "to keep certain groups of citizens from voting").

To achieve its aim of accuracy, the NVRA required states to inform applicants about registration requirements and the penalties for false registration.  42 U.S.C. § 1973gg-6(1)(5).  And to achieve its aim of removing obstacles preventing eligible voters from voting, the NVRA established processes that made it easier for individuals to register to vote, *see e.g.* 42 U.S.C. §§ 1973gg-3, -4, -5, and limited the grounds on which States could remove individuals from the voter rolls.  *See* 42 U.S.C. § 1973gg-6(c)(2)(B)(i).  To that end, it barred any systematic purges within 90 days of an election.  42 U.S.C. § 1973gg-6(c)(2)(A).  Congress evidently feared that systematic removal programs conducted on the verge of an election could result in the disenfranchisement of eligible voters without adequate time to correct for mistakes before the voting period ended.

Indeed, Congress adopted the 90-day provision in the face of the exact concerns voiced by Florida here.  In both the House and Senate, members of Congress opposed the NVRA because they claimed it "seriously impede[d] states' ability to combat fraud in order to increase voter turnout."  H.R. Rep. No. 103-9, at 136 (statement of minority views); *see also* S. Rep. 103-6.  Opponents fretted that "[t]he bill limit[ed] the state's ability to . . . remove ineligible voters from the rolls," H.R. Rep. No. 103-9, at 136, which raised the "special concern . . . that *illegal aliens* w[ould] end up on the voter rolls," *id.* at 138 (emphasis added).  Senator Mitch McConnell even proposed a series of amendments that would have added "citizenship status" to the reasons for permissible removal .  *See* 139 Cong. Rec. 2960 (Mar. 16, 1993) (Amendment No. 100); 139

Cong. Rec. 2970 (Amendment No. 141), and 139 Cong. Rec. 3066 (Mar. 17, 1993) (Amendment No. 169).

Congress did not adopt these amendments and enacted the NVRA over these dissenting voices. And with good reason: there was – and is still – little evidence that voting fraud is a widespread problem,[4] while history is replete with examples of abusive voter purge efforts conducted solely to discriminate against minority voters. On those grounds, courts have generally recognized that in the NVRA Congress struck the balance in favor of protecting eligible voters even if doing so meant ineligible voters remained on the rolls. *See, e.g.*, *Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1080 (D. Mont. 2008) (concluding that a defendant's steps to challenge the voter eligibility of 6000 voters on the basis of change in address, within the 90-day quiet period, created an "unacceptable risk that eligible voters will be denied the right to vote").[5]

---

[4] As shown by the experience in Miami-Dade, evidence of voting by ineligible individuals is negligible compared to the number of eligible voters included in the State's initial purge list of 2,625 individuals. Ex. B  (Smith Decl. and Rpt.), ¶ 39.

[5] *See also Gonzalez v. Arizona*, 677 F.3d 383, 403 (9th Cir. 2012) (holding that, since the NVRA already provided "numerous fraud protections," the statute prohibited a state from requiring a person to show proof of citizenship before registering to vote); *Democratic Nat'l Committee v. Republican Nat'l Committee*, 673 F.3d 192 (3d Cir. 2012) (holding that removal of a consent decree aimed at protecting minority precincts posed a greater threat to the electoral process than rare instances of in-person voter fraud); *Summit County Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547 (6th Cir. 2004) (erring on the side of protecting the right to exercise the franchise over preventing voter fraud because "the rights of those seeking to prevent voter fraud are already well protected by the election protocols established by the state"). Indeed, even in an instance where the NVRA *permitted* the removal of a particular group of voters within the 90-day quiet period, a court has issued an injunction based on its recognition that large-scale, systematic purges shortly before an election have the potential of excluding eligible voters. *See Curtis v. Smith*, 121 F. Supp. 2d 1054 (E.D. Tex. 2000) (issuing a preliminary injunction to prevent removing 9000 voters based on a residency challenge filed 57 days before a federal election).

II.     **ARGUMENT**

A.  The Plaintiffs Are Entitled to a Preliminary Injunction.

The Plaintiffs seek a preliminary injunction barring the Defendant from continuing to implement the Program to Purge Alleged Non-Citizens.  They are entitled to an injunction because they can demonstrate:  "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to [them] outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest."  *Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011).  Because the State of Florida is the non-moving party, "the third and fourth considerations are largely the same."  *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010).

1.      *Likelihood of Success on the Merits*

a.  Florida's Ongoing Implementation of Its Program to Purge Alleged Non-Citizens Violates the Plain Language of the NVRA's 90-Day Provision.

In the NVRA, Congress recognized that purges conducted immediately before an election present particularly serious threats to eligible voters because such voters typically lack the time and opportunity to correct errors and are irrevocably denied the right to participate in that election.  *See supra* Part I.B.  Thus, to protect *eligible* voters from the inevitable inaccuracies of systematic purges, Congress explicitly barred such purges within 90 days of a federal election. Defendant's Program to Purge Alleged Non-Citizens violates this explicit bar.  The statute provides:

A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

9

42 U.S.C. § 1973gg-6(c)(2)(A) (the "90-day provision").

Florida's planned purge is still ongoing within 90 days of the November 6th federal election and appears likely to continue until much closer to the election.   Thus, the purge is not permissible if it is a "program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."   *Id.*   And it plainly is.   Its purpose is to "remove ineligible voters" – non-citizens – from the voter rolls, and it does so systematically – through a general, statewide program using database matching.   That sort of systematic program may be permissible outside the 90-day quiet period, *see id.* § 1973gg-6(a)(4), but it is prohibited within that 90-day period.

Underscoring this conclusion, the NVRA makes clear that certain *other* types of removals *are* permissible within the 90-day quiet period.   The NVRA states that the 90-day prohibition on systematic purges should not "be construed" to bar the removal of voters who: (1) request to be removed; (2) are convicted of a crime; (3) are mentally incapacitated; or (4) die.   *See* 42 U.S.C. § 1973gg-6(c)(2)(B)(i).[6]   It also states the 90-day provision should not be construed to preclude the "correction of registration records pursuant to this subchapter."   *Id.* § 1973gg-(6)(c)(2)(B)(ii).   Each of these categories of removals potentially can occur using non-systematic means.   None of

_____

[6] That subsection provides:

[§ 1973gg-(6)(c)(2)(A)] shall not be construed to preclude—

(i) the removal of names from official lists of voters on a basis described in paragraph 3(A) or (B) or 4(A) of section (a) of this section; or

Paragraph 3(A) permits removal based on "the request of the registrant," while Paragraph 3(B) permits removal "as provided by State law, by reason of criminal conviction or mental incapacity."   *See* 42 U.S.C. § 1973gg(6)(a)(3)(A) & (B).   Paragraph 4(A) permits states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official list of eligible voters by reason of . . . the death of the registrant."   *Id.* § 1973gg-(6)(a)(4)(A).

them apply here.  The first four provisions in subsection (c)(2)(B)(i) plainly do not encompass Florida's planned purge on the basis of non-citizenship.  And as for the fifth in subsection (c)(2)(B)(ii) – the "correction of registration records pursuant to this subchapter [I-H of Chapter 20 of Title 42]" – the subchapter only permits the "correction" of registration records in two instances, both of which involve changes in residence.  *See* 42 U.S.C. § 1973gg-6(d)(1)(B)(ii); 42 U.S.C. § 1973gg-6(f).  Those instances are not implicated here either.  Therefore, the plain meaning of the 90-day provision prohibits Florida's planned purge – a conclusion reinforced by the fact that the statute specifies particular types of removals that can occur, and none of those removals apply here.

> b.  The Contrary Dicta in *United States v. Florida* Ignores the NVRA's Plain Language and Is Not Persuasive.

In dicta, another Florida federal court stated that the NVRA's 90-day provision did not apply to the removal of noncitizens.[7]  It did so by reading the 90-day provision to only apply to the systematic removal of individuals who were properly registered initially, but subsequently lost eligibility.  Because non-citizens "were not properly registered in the first place," the court reasoned, a State would be free to conduct a systematic program to remove them at any time. *United States v. Florida*, 2012 WL 2457506, at *3 ("ND Decision").

The plain language of the NVRA does not support the ND Decision's distinction between once-eligible voters and never-eligible voters.  The 90-day provision broadly bars "*any* program the purpose of which is to systematically remove the names of ineligible voters," without any

---

[7] The court held that the plaintiffs in that case were not entitled to an injunction because, at that time, Secretary Detzner had unequivocally abandoned his plan to purge alleged non-citizens.  *See* 2012 WL 2457506, at *4 ("There is no need for an injunction prohibiting the Secretary from continuing with a program he has unequivocally said he will not continue.").  Thus, the court's holding did not rest on its analysis of the NVRA.

reference to whether these ineligible voters were formerly eligible.  42 U.S.C. § 1973gg-6(c)(2)(A) (emphasis added).   Because this Court should give effect to the plain meaning of the 90-day provision, *see United States v. Silva*, 443 F.3d 795 (11th Cir. 2006), it should not adopt the ND Decision's reading.  *See, e.g.*, *In re Read*, 2012 WL 3738062, at *3 (11th Cir. 2012) ("It is [the Court's] duty, 'to give effect, if possible to every clause and word of a statute.'").[8]

The ND Decision attempts to provide a textual basis for its interpretation, but it twists the statutory language beyond recognition.  Rather than starting with the language or purpose of the 90-day provision, the court begins with an interpretation of a different statutory section – section (a)(3) of the NVRA (the "general removal provision") – which describes the ways in which a State can remove certain individuals from the voting rolls at any time.  The court posits that although the general removal provision does not explicitly permit the removal of non-citizens from the rolls, States must be allowed to do so as a matter of common sense.  ND Decision, 2012 WL 2457506, at *3.   The court then submits that because the 90-day provision, like the general removal provision, uses the term "remove," it too must contain an implicit exception for systematic purges of non-citizens.  ND Decision, 2012 WL 2457506, at *3.

The Northern District thus begins with an *assumption* about what the general removal provision permits (the removal of non-citizens at some point in time) and leaps to a conclusion that a separate provision – the 90-day provision – means something contrary to its express terms.  This reasoning must be seen for what it is:  an interpretation that reads a vast exception into the 90-day provision without even trying to surmount the very high bar needed to justify such an

---

[8] No inference can be drawn from the categories of individuals the NVRA expressly permits to be removed, since these categories include individuals who were never eligible to vote as well as individuals who were once eligible to vote.  For example, the category of convicted felons includes those who were felons when they registered as well as those who only became felons after they registered.

exception – that a "literal application of [the provision] will produce a result demonstrably at odds with the intentions of its drafters."  *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)) (brackets omitted from original); *see also TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (holding that courts should be particularly hesitant to read additional limitations into a statute when, as here, the statute already contains explicit provisions on what is consistent with the statute).

In concluding that Congress only intended for the 90-day provision to cover the removal of voters "on grounds that typically arise *after* an initial proper registration," 2012 WL 2457506, at *3, the ND Decision does not point to any evidence that a literal application of the 90-day prohibition to Defendant's intended purge would be demonstrably at odds with Congress' purpose in enacting the NVRA.  *Ron Pair Enterprises, Inc.*, 489 U.S. at 242.  As the legislative history of the statute shows, *see supra* Part I.B, Congress intended for the NVRA to encourage voting and prevent States from removing eligible voters from their rolls.  Adding a vast exception to the application of the 90-day provision subverts those goals.  The ND Decision also fails to explain why Congress would have barred systematic purges aimed at once-eligible voters within 90 days of an election, but permitted systematic purges aimed at never-eligible voters.  On the eve of an election, a systematic purge of never-eligible voters would pose the same threat to eligible voters that a purge of once-eligible voters would.

To be clear, the Plaintiffs agree that if the statutory language reasonably permits it, the general removal provision should be interpreted so as not to preclude states from removing any non-citizen (or any other individual, such as a sixteen-year old) who was ineligible when they

initially registered.[9]  But the intuition that this should be permitted cannot be a basis to read the general removal provision in a manner that distorts the plain meaning of the separate 90-day provision.

Fortunately, there is no need to adopt such a reading of the 90-day provision to conclude that the general removal provision permits removal of non-citizens.  Unlike the 90-day provision, the general removal provision applies only to state actions with respect to "registrants."  The general removal provision permits states to remove registrants only at the request of the registrant, (§ (a)(3)(A)); by reason of criminal conviction or mental incapacity (if provided by State law) (§ (a)(3)(B)); due to the death of the registrant, (§ (a)(3)(C)); or due to a change in the residence of the registrant, (§ (a)(3)(C)).  But the general removal provision does not impose any limitations on the bases on which states can remove *non-registrants*.

Given the common-sense intuition that states should be able to remove non-citizens from the voter rolls, this Court could – and should – conclude that non-citizens are not "registrants." Even if non-citizens somehow end up on the voter rolls, likely as a result of a mistake by state officials, they are not registrants because they were not eligible to register in the first place. Crucially, that conclusion would not govern the applicability of the 90-day provision because the 90-day provision does not use the term "registrant."  Instead, the 90-day provision applies to any efforts "to systematically remove the names of *ineligible voters* from the official lists of eligible voters."  42 U.S.C. § 1973gg-6(c)(2)(A) (emphasis added).  Non-citizens are incontrovertibly "ineligible voters."

---

[9] And indeed, the Plaintiffs believe non-citizens may be removed from the voting rolls within 90 days of a federal election – as long as the removal is not part of a systematic program, as it is here.

This reading is superior to the ND Decision's reading for three reasons. First, it does not place more meaning on the term "remove" than it can bear.  The ND decision found that because the general removal provision does not apply to the removal of non-citizens, and because both the general removal provision and the 90-day provision use the term "remove," the 90-day provision also must not apply to the removal of non-citizens.  ND Decision, 2012 WL 2457506, at *3.  But the verb "remove" only defines the action that is taken, not the object on which that action is taken.  *See, e.g.*, *ACLU of Florida, Inc. v. Miami-Dade County School Bd.*, 557 F.3d 1177, 1219 (11th Cir. 2009) ("The word 'remove' means 'to move from a place or position; take away or off.'").  There is nothing about the term "remove" that provides a remotely plausible basis for concluding that the general removal provision bars removal of citizens but permits removal of non-citizens.  Such a conclusion is far more reasonably grounded in the term "registrant," which speaks to the characteristics of the person being removed.[10]

Second, reliance on  the term "registrant" as a basis for interpreting the general removal provision to permit removal of non-citizens avoids the need to distort the 90-day provision in order to arrive at this interpretation.  It also explains Congress' use of different terms in the two provisions:  "registrant" in the general removal provision, but the broader term "ineligible voters" in the 90-day provision.

---

[10]  The ND Decision itself seems to acknowledge that its decision is not actually grounded in the term "remove."  In concluding that systematic purges aimed at non-citizens are permissible, the Decision states that the 90-day provision "does not prohibit a state from systematically *removing* improperly registered noncitizens during the quiet period."  2012 WL 2457506, at *3 (emphasis added).  But once the court acknowledges that taking noncitizens off the rolls constitutes removal within the meaning of the 90-day provision, its observation that the term remove means the same thing throughout the NVRA becomes irrelevant.  Yet that is the entire lynchpin of its conclusion that Defendant's actions are consistent with the 90-day provision.

Third, the ND Decision's interpretation renders the 90-day provision essentially meaningless.  Under the court's view in that case, both the general removal provision and the 90-day provision apply to the same category of voters; both address  removals only of once-eligible voters.  But that renders the 90-day provision almost entirely superfluous because, with certain narrow exceptions involving changes in residence, the provision does not apply to any of the removals permitted by the general removal provision.  *Compare* 42 U.S.C. § 1973gg-6(a)(3) (permitting removals of registrants based on:  (1) the registrant's request; (2) criminal conviction or mental incapacity; (3) the registrant's death; or (4) changes in residence), *with* 42 U.S.C. § 1973gg-6(c)(2)(B) (stating that the 90-day provision should not be construed to preclude removals based on (1) the registrant's request, (2) criminal conviction or mental incapacity, or (3) the registrant's death; and (4) corrections under this subchapter, which in turn specifies two types of corrections involving change in residency).  Under the Plaintiffs' alternative reading, however, the two provisions apply to different categories of voters:  the general removal provision applies only to registrants (once-eligible voters who are now ineligible), while the 90-day provision applies to "any"  programs to systematically remove ineligible voters.  That difference explains why it made sense for Congress to include the 90-day provision, with its sweeping language, in the NVRA even after already including the general removal provision.

In sum, nothing about the general removal provision in the NVRA alters the conclusion that the plain language of the 90-day provision bars Florida's intended purge.  Nor does the language of the general removal provision justify reading an unenumerated exception into the 90-day provision – a statute that already specifies several other types of removals that can be acceptable.  The term "registrant," unlike the term "remove," provides a reasonable way for this Court to read the NVRA as permitting removal of non-citizens outside the 90-day window

without distorting the expressly broad application of the 90-day provision.  Even were that not

so, however, the assumption that the general removal provision should be read to permit removal

of non-citizens would not justify contorting the term "remove" beyond recognition and then

reading that contorted definition into the 90-day provision.

Through the 90-day provision, Congress intended to protect *eligible* voters from the

inevitable inaccuracies of systematic purges conducted in close proximity to an election.  The

need for such protection does not depend on the type of ineligible voters the purge targets.  This

Court should read the provision as Congress wrote it.

### 2.   *Irreparable Harm*

Florida's unlawful purge program irreparably harms Plaintiffs by abridging the individual

Plaintiffs' right to vote, and irreparably harms the organizational Plaintiffs by forcing them to

divert scarce resources they would use for other purposes to educating, addressing, and otherwise

protecting their members from the results of Florida's purge.  Ex. C (Decl. of Maria Del Rosario

Rodriguez, Florida Immigrant Coalition), ¶¶  3, 4; Ex. D (Decl. of Dale Ewart, 1199SEIU United

Healthcare Workers), ¶¶ 4,5; Ex. E (Decl. of Wilfredo Seda, National Congress for Puerto Rican

Rights), ¶ 4.[11]   Indeed, where a civil rights statute such as the NVRA provides for injunctive

relief, "irreparable injury should be presumed from the very fact that the statute has been

violated."  *United States v. Hayes International Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969).

Here, Plaintiffs have shown a substantial likelihood of success on their NVRA claims, and

accordingly, the Court should presume they will be irreparably harmed.  *Id.*; *see also Harris v.*

---

[11]  Puerto Ricans, who are citizens of the United States by operation of law, are
particularly vulnerable to being disenfranchised by the Defendant's unlawful practices.  By law,
Puerto Rican birth certificates were invalidated in 2010.  As a result, if Puerto Ricans are purged
in the coming days for allegedly being non-citizens, they may not be able to obtain the necessary
documentation to challenge that action prior to the election.  *See* Ex. E (Seda Decl.), ¶¶ 4-5.

*Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984) ("any legal impediment to the right to vote, as guaranteed by the U.S. Constitution or statute, would by its nature be an irreparable injury").

In addition to affecting the Plaintiffs' fundamental rights, the Defendant's planned purge will also cause injuries that "cannot be undone through monetary remedies." *Northeastern Fla. Chapter of Ass'n of Contractors of Am. v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). "Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance." *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986).   The injuries are also "actual and imminent." *Northeastern Fla.*, 896 F.2d at 1285. The fixed date of the upcoming general election makes the harm to eligible voters both imminent and clearly foreseeable.  The NVRA's 90-day prohibition on systematic purges in fact acts as a prophylactic against the harm an eligible voter suffers when he or she is improperly removed from the rolls without sufficient time to remedy the error.  *See* 42 U.S.C. § 1973gg-6(c)(2)(A).  When the 90-day quiet period is violated, as here, eligible voters suffer imminent harm in the face of the impending deadline of an Election Day on which they may find themselves unable to vote a regular ballot.

> ### 3.   *Balance of Harms/Public Interest*

The relative harms support the issuance of an injunction.  The Program to Purge Alleged Non-Citizens creates the risk that the Plaintiffs and similarly situated individuals will be removed from the voting rolls without justification and without time for recourse.  That implicates the Plaintiffs' fundamental right to vote.  By contrast, the State's Program advances only minimally its purported interest in removing ineligible voters from the rolls – by the State's own account, even its unconfirmed list of *potential* non-citizens represents a miniscule

18

percentage of all eligible voters.  *See* Ex. B (Smith Decl. and Rpt.), ¶ 15.  Indeed, the NVRA has already struck the balance of interests in the Plaintiffs' favor.  As the Sixth Circuit recognized in denying a state's request to stay a preliminary injunction shortly before the 2008 general election, "[t]hough the public certainly has an interest in a state being able to maintain a list of electors that does not contain any false or erroneous entries, a state cannot remove those entries in a way which risks invalidation of properly registered voters."  *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008).

Granting the Plaintiffs' injunctive relief will also serve the public interest.  As another Florida federal court recently held in an NVRA case enjoining the enforcement of new state voter registration statutes, "vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition."  *League of Women Voters of Florida v. Browning*, 2012 WL 1957793, at *11 (N.D. Fla. May 31, 2012).  Thus, by demonstrating a substantial likelihood of success on the merits of their NVRA claim, the Plaintiffs have shown that an injunction would further the public interest as well.

B.  The Plaintiffs Are Also Entitled to Summary Judgment

"Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact."  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).  Here, there is no factual dispute about whether the Program to Purge Alleged Non-Citizens violates the 90-day provision of the NVRA.  The plain meaning of the statute prohibits the Defendant from continuing to implement a program with the stated purpose of systematically purging non-citizens from the voting rolls.  The Court does not need any facts to reach that conclusion beyond those listed in the Plaintiffs' Statement of Undisputed Facts.  Accordingly, if it finds the Plaintiffs are substantially likely to

19

succeed on their purely legal statutory claim, it should enter summary judgment for the Plaintiffs as well.

## III.    CONCLUSION

For the foregoing reasons, the Plaintiffs request that the Court issue a preliminary injunction barring the State from any further action on its Program to Purge Alleged Non-Citizens.  And because there is no factual dispute that the Program to Purge Alleged Non-Citizens violates the NVRA, the Plaintiffs request that the Court enter summary judgment for the Plaintiffs.


Dated:  September 19, 2012                                    Respectfully submitted,


                                                             /s/  Katherine Roberson-Young_____
                                                             Katherine Roberson-Young, Esq.
                                                             Florida Bar No. 038169
                                                             3000 Biscayne Blvd., Suite 212
                                                             Miami, Florida 33137
                                                             (305) 571-4082
                                                             (305) 571-1396 (fax)
                                                             katherine.roberson-young@seiu.org



Of Counsel:

Catherine M. Flanagan                         Lorelie S. Masters
Michelle Kanter Cohen                         Marc A. Goldman
**PROJECT VOTE**                              **JENNER & BLOCK, LLP**
1350 I St., N.W., Suite 1250                  1099 New York Ave., N.W.
Washington, DC 20005                          Suite 900
(202) 546-4173                                Washington, DC  20001-4412
(202) 629-3754 (fax)                          (202) 639-6000
cflanagan@projectvote.org                     (202) 639-6066 (fax)
mkantercohen@projectvote.org                  lmasters@jenner.com
                                              mgoldman@jenner.com

Ben Hovland
**FAIR ELECTIONS LEGAL NETWORK**
1825 K Street NW, Suite 450
Washington, D.C. 20006
(202) 248-5346
(202) 331-1663 (fax)
bhovland@fairelectionsnetwork.com

Juan Cartagena
Jose Perez, Esq.
Diana Sen, Esq.
**LATINOJUSTICE PRLDEF**
99 Hudson Street, 14th Floor
New York, NY 10013-2815
(212) 219-3360
(212) 431-4276 (fax)
jcartagena@latinojustice.org
jperez@latinojustice.org
dsen@latinojustice.org

J. Gerald Hebert
**CAMPAIGN LEGAL CENTER**
215 E Street NE
Washington, DC 20002
(202) 736-2200
ghebert@campaignlegalcenter.org

Penda Hair
Katherine Culliton-Gonzalez, Esq.
Uzoma Nkwonta, Esq.
**ADVANCEMENT PROJECT**
1220 L Street, N.W., Suite 850
Washington, D.C. 20005
(202) 728-9557
(202) 728-9558 (fax)
pendahair@advancementproject.org
kcullitongonzalez@advancementproject.org
unkwonta@advancementproject.org

John De Leon
Florida Bar No. 650390
**LAW OFFICES OF CHAVEZ & DE LEON**
5975 Sunset Drive, Suite 605
South Miami, FL 33143
(305) 740-5347
(305) 740-5348 (fax)
jdeleon@chavez-deleon.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on September 19, 2012, a true and correct copy of the foregoing was served on all counsel of record via CM/ECF.


Dated: September 19, 2012                    By:   /s/  Katherine Roberson-Young_____
                                                   Katherine Roberson-Young, Esq.