# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303



John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

December 04, 2014

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  12-15738-EE
Case Style: Karla Arcia, et al v. Florida Secretary of State
District Court Docket No: 1:12-cv-22282-WJZ

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

JOHN LEY, Clerk of Court

Reply to:  Brenda H. McConnell
Phone #:  (404) 335-6209

Enclosure(s)

MDT-1 Letter Issuing Mandate

**UNITED STATES COURT OF APPEALS**
**For the Eleventh Circuit**

_____

No. 12-15738

_____

District Court Docket No.
1:12-cv-22282-WJZ

KARLA VANESSA ARCIA,
Individually,
MELANDE ANTOINE,
Individually,
FLORIDA IMMIGRANT COALITION, INC.,
Non-Profit Corporation,
NATIONAL CONGRESS FOR PUERTO RICAN RIGHTS,
Non-Profit Corporation,
FLORIDA NEW MAJORITY, INC.,
Non-Profit Corporation,
199SEIU UNITED HEALTHCARE WORKERS EAST FLORIDA,
a labor union,
VEYEYO,
a Civic Organization based in Miami Dade County,

                    Plaintiffs - Appellants,

versus

FLORIDA SECRETARY OF STATE,

                    Defendant - Appellee,

LUIS I. GARCIA, et al.,

                    Intervenor Defendants.

_____

Appeal from the United States District Court for the
Southern District of Florida
_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court.

Entered: November 17, 2014
For the Court: John Ley, Clerk of Court
By: Djuanna Clark

ISSUED AS MANDATE:  12/4/2014

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15738
_____

D.C. Docket No. 1:12-cv-22282-WJZ

KARLA VANESSA ARCIA,
MELANDE ANTOINE, et al.,

Plaintiffs-Appellants,

versus

FLORIDA SECRETARY OF STATE,

Defendant-Appellee,

LUIS I. GARCIA, et al.,

Intervenor Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 17, 2014)

Before MARTIN, JORDAN and SUHRHEINRICH,[*] Circuit Judges.

_____

[*] Honorable Richard F. Suhrheinrich, United States Circuit Judge for the Sixth Circuit, sitting by

MARTIN, Circuit Judge:

The panel vacates the opinion issued in this case on April 1, 2014.  We reissue this opinion without the concurring opinion of Judge Jordan, and otherwise the opinion remains the same.

Section 8(c)(2)(A) of the National Voter Registration Act (the 90 Day Provision) requires states to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  42 U.S.C. § 1973gg-6(c)(2)(A).  This provision became the center of a legal dispute in 2012, when a group of individual voters and organizations sued Florida Secretary of State Kenneth W. Detzner.  These plaintiffs argued that Florida was violating the 90 Day Provision by conducting a program to systematically remove suspected non-citizens from the voter rolls within 90 days of a federal election.  The District Court denied the plaintiffs' motions for a preliminary injunction and summary judgment, and entered judgment in favor of Secretary Detzner.  The plaintiffs now appeal.

Because we conclude that Florida's program was an attempt to systematically remove names from the voter rolls in violation of the 90 Day Provision, we reverse and remand.

––––––––––––––––––––––

designation.

2

# I.     FACTS AND PROCEDURAL HISTORY

This case concerns Florida's efforts to remove the names of ineligible voters from the State's voter rolls prior to the 2012 primary and general elections. Concerned about people who are not citizens casting ballots in Florida elections, Secretary of State Detzner engaged in two separate programs to identify and remove non-citizens from the Florida voter rolls.

Secretary Detzner's first program began in advance of the primary election and used records from the Department of Highway Safety and Motor Vehicles (DHSMV). The Secretary started by compiling a list of registered voters who had previously presented the DHSMV with identification—such as green cards or foreign passports—suggesting that they may be non-citizens. After putting together this list, he sent a portion of it to the State Supervisor of Elections in each county, instructing them to (1) review the names on the list, (2) conduct additional research using "whatever other sources you have," and (3) initiate a notice and removal process. Secretary Detzner suspended the program at the end of April 2012. Records indicate, however, that suspected non-citizens continued to be removed from the voter rolls during May and June, which was less than 90 days before the Florida primary election.

This first effort by Secretary Detzner to identify non-citizens was far from perfect. For example, Plaintiffs Karla V. Arcia and Melande Antoine were

identified as non-citizen voters to be removed from the voter rolls.  This, despite the fact that they were both United States citizens eligible to vote in the 2012 elections.  Also, organizations like the Florida Immigration Coalition, Inc., the National Congress for Puerto Rican Rights, and 1199SEIU United Healthcare Workers East (1199SEIU) diverted resources from their regularly-conducted programs and activities to counteract the effects of the Secretary's program.  These efforts included locating and assisting members who had been wrongly identified as non-citizens to ensure that they were able to vote.

Despite these shortcomings in his initial program, Secretary Detzner renewed his efforts to remove non-citizens from the voter rolls in advance of the 2012 general election.  Rather than use the DHSMV records, this second program relied on the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) database.  Secretary Detzner also announced that he would not wait until after the general election to implement his program.  Even though there were less than 90 days before the general election, Secretary Detzner stated publicly that he planned to forward the names of registered voters identified as non-citizens in the SAVE database to State Supervisors.

This case began on June 19, 2012, when the plaintiffs first challenged Secretary Detzner's efforts to remove non-citizens prior to the Florida primary election.  Among other things, the plaintiffs alleged that they were entitled to

declaratory and injunctive relief because the Secretary's actions were barred by the 90 Day Provision. After Secretary Detzner announced that he would resume the removal of purported non-citizens from the voter rolls using the SAVE database, the plaintiffs amended their complaint, arguing that the Secretary's program still violated the NVRA's 90 Day Provision because of the proximity to the general election. The plaintiffs sought a preliminary injunction and summary judgment.

The District Court found that the 90 Day Provision did not apply to the Secretary's efforts to remove non-citizens from the voter rolls and denied the plaintiffs' motions for an injunction and summary judgment. At the plaintiffs' request, the District Court also entered judgment as a matter of law in favor of Secretary Detzner. Plaintiffs now appeal this final judgment.[1]

## II.   JURISDICTIONAL ISSUES

Before reaching the merits, we must first determine whether we have Article III jurisdiction over the parties and issues presented here. In particular, we must decide (1) whether the plaintiffs have standing and (2) whether this case is moot because the 2012 elections have passed.

---

[1] The plaintiffs filed a motion to expedite this appeal, arguing that the Secretary's program risked disfranchising eligible voters incorrectly identified as non-citizens on the eve of the general election. Based on Secretary Detzner's assurances that no citizens would be mistakenly removed from the voter rolls before Election Day, this Court denied the plaintiffs' motion to expedite their appeal.

## A. STANDING

Secretary Detzner claims that neither the individual nor the organizational plaintiffs have standing because they did not suffer an "injury-in-fact." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992). "We review issues of standing de novo." Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla., 641 F.3d 1259, 1264 (11th Cir. 2011). Standing is determined at the time the plaintiff's complaint is filed. Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003).

"'Injury in fact' reflects the statutory requirement that a person be 'adversely affected' or 'aggrieved,' and it serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14, 93 S. Ct. 2405, 2417 n.14 (1973) (noting that "an identifiable trifle is enough"). An injury-in-fact involves "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." See Lujan, 504 U.S. at 560, 112 S. Ct. at 2136 (quotation marks and internal citations omitted).

1. Individual Plaintiffs

The individual plaintiffs, Ms. Arcia and Ms. Antoine, have standing because (1) they were directly injured by Secretary Detzner's first program before the 2012

primary election and (2) at the time they filed their complaint, they had established a probable future injury allowing them to prospectively challenge Secretary Detzner's second program before the 2012 general election.

Ms. Arcia and Ms. Antoine had standing to challenge Secretary Detzner's first program before the 2012 primary election because they were directly injured by it when they were wrongly identified as non-citizens.  Even though they were ultimately not prevented from voting, an injury like theirs is sufficient to confer standing.  See Common Cause/Ga. v. Billups, 554 F.3d 1340, 1351–52 (11th Cir. 2009) (finding that requirement to produce photo identification to vote was an injury sufficient to confer standing even though the right to vote was not "wholly denied"); Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1352 (11th Cir. 2005) (finding sufficient the injury of being unable to vote in home precinct because state government rejected voter's use of the federal registration form to change her address).

Ms. Arcia and Ms. Antoine also have standing to prospectively challenge the Secretary's second attempt to remove non-citizens from the voter rolls using the SAVE database.  When the harm alleged is prospective, as it was here, a plaintiff can satisfy the injury-in-fact requirement by showing imminent harm.  Fla. State Conf. of the NAACP v. Browning, 522 F.3d 1153, 1160–61 (11th Cir. 2008). While the threatened future injury cannot be merely hypothetical or conjectural,

7

probabilistic harm is enough.  Id. at 1162–63.  Because Ms. Arcia and Ms. Antoine

were naturalized U.S. citizens from Nicaragua and Haiti respectively, there was a

realistic probability that they would be misidentified due to unintentional mistakes

in the Secretary's data-matching process.  See id. at 1163–64 (distinguishing

foreseeable injuries from those based on assumptions and conjecture).  This being

the case, Ms. Arcia and Ms. Antoine sufficiently established standing based on the

potential errors that could occur when the Secretary attempted to confirm their

immigration status in various state and federal databases in the hurried 90-day

window before the election.

2.  Organizational Plaintiffs

   The organizational plaintiffs also have standing to challenge Secretary

Detzner's program based on both a diversion-of-resources theory and an

associational standing theory.

   Under the diversion-of-resources theory, an organization has standing to sue

when a defendant's illegal acts impair the organization's ability to engage in its

own projects by forcing the organization to divert resources in response.  Havens

Realty Corp. v. Coleman, 455 U.S. 363, 379, 102 S. Ct. 1114, 1124 (1982)

("[C]oncrete and demonstrable injury to the organization's activities—with the

consequent drain on the organization's resources—constitutes far more than simply

a setback to the organization's abstract social interests.").  For example, our

precedent provides that organizations can establish standing to challenge election laws by showing that they will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day.  See Browning, 522 F.3d at 1165–66.

Here, all three of the organizational plaintiffs—the Florida Immigrant Coalition, Inc., the National Congress for Puerto Rican Rights, and 1199SEIU—submitted affidavits showing they have missions that include voter registration and education, or encouraging and safeguarding voter rights, and that they had diverted resources to address the Secretary's programs.  A representative from 1199SEIU also testified that after some of its members were identified as potential non-citizens before the primary election, the organization expended resources to locate and assist the members to ensure that they were able to vote.[2]  This redirection of resources to counteract the Secretary's removal program is a concrete and demonstrable injury, not an "abstract social interest[]."  Havens Realty Corp., 455 U.S. at 379, 102 S. Ct. at 1124.

The organizational plaintiffs also have standing to challenge Secretary Detzner's programs under an associational standing theory.  An organizational plaintiff has standing to enforce the rights of its members "when its members

---

[2] This fact, together with Mr. Arcia and Ms. Antoine being included on the Secretary's list of purported non-citizens, distinguish this case from Clapper v. Amnesty International USA, ___ U.S. ___, 133 S. Ct. 1138 (2013), in which the Court found the plaintiffs' theory of standing "relie[d] on a highly attenuated chain of possibilities."  Id. at 1148.

would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Friends of the Earth, Inc., v. Laidlaw Envt'l Servs. (TOC), Inc.</u>, 528 U.S. 167, 181, 120 S. Ct. 693, 704 (2000).  Based on our review of the affidavits provided on behalf of the organizational plaintiffs, we have concluded that the interests at stake in this case are germane to the purposes and goals of the organizations.  Further, the declaratory and injunctive relief sought by the organizations does not require the individual participation of the organizations' members. <u>Browning</u>, 522 F.3d at 1160.   The only remaining issue is whether the members of the organizations themselves would have standing.  We conclude that they do.

In order to sue on behalf of its members, organizational plaintiffs need not establish that all of their members are in danger of suffering an injury.  Rather, the rule in this Circuit is that organizational plaintiffs need only establish that "at least one member faces a realistic danger" of suffering an injury. <u>Id.</u> at 1163.  As in <u>Browning</u>, the organizational plaintiffs here argue that the process of matching voters across various databases creates a foreseeable risk of false positives and mismatches based on user errors, problems with the data-matching process, flaws in the underlying databases, and similarities in names and birthdates. <u>See id.</u> at 1163 (finding that "the injuries are foreseeable and the expected results of

unconscious and largely unavoidable human errors in transcription").  The three organizational plaintiffs also represent a large number of people, like Ms. Arcia and Ms. Antoine, who face a realistic danger of being identified in the Secretary's removal programs because of their names or status as naturalized citizens.  See id. (finding that large organizations like the NAACP had standing because there was a high probability that at least one of the members would be mistakenly mismatched).  On this record, the organizational plaintiffs have sufficiently established their standing to bring this action on behalf of their members.

## B. MOOTNESS

Secretary Detzner next argues that the plaintiffs' claims are moot because the 2012 elections have passed.  We retain jurisdiction to decide this case, however, because the exception to mootness for disputes "capable of repetition yet evading review" applies here.

The "capable of repetition, yet evading review" exception to the mootness doctrine applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.  Davis v. FEC, 554 U.S. 724, 735, 128 S. Ct. 2759, 2769–70 (2008) (quotation marks omitted) (rejecting mootness argument despite fact that election had passed).  Both of these requirements are met here.

11

First, the plaintiffs are correct that Secretary Detzner's actions were too short in duration to be fully litigated prior to their cessation.  In election cases, we have stated that there is often "not sufficient time between the filing of the complaint and the election to obtain judicial resolution of the controversy before the election."  Teper v. Miller, 82 F.3d 989, 992 n.1 (11th Cir. 1996).  Election cases also frequently present issues that will persist in future elections, and resolving these disputes can simplify future challenges.  See id.  Here, the plaintiffs could not challenge Secretary Detzner's program until it became clear that it would continue past the 90th day before an election, giving the plaintiffs just three months before the case became moot.  Based on this record, we conclude that the Secretary's actions here were in their duration too short to be fully litigated prior to their cessation or expiration.  See Bourgeois v. Peters, 387 F.3d 1303, 1309 (11th Cir. 2004) ("[W]e conclude that one year is an insufficient amount of time for a district court, circuit court of appeals, and Supreme Court to adjudicate the typical case.").

Second, there is a reasonable expectation that these plaintiffs will be subjected to Secretary Detzner's program again.  The District Court's ruling was not limited to the 2012 elections or the specific program employed by the Secretary in 2012.  Rather, it interpreted the 90 Day Provision generally to allow systematic removal programs based on citizenship during the last 90 days before an election.

The Secretary has also not offered to refrain from similar programs within the 90-day window in the future.  Thus, there is a reasonable expectation that the plaintiffs will be subject to the same action again.

For these reasons, we have jurisdiction over this case, even though the 2012 elections have passed.

## III.   DISCUSSION

We now turn to the merits of this dispute.  The primary issue here involves the statutory interpretation of the 90 Day Provision, which is codified at 42 U.S.C. § 1973gg-6(c)(2)(A).  The 90 Day Provision requires that:

> A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

42 U.S.C. § 1973gg-6(c)(2)(A).  The issue presented is whether "any program . . . to systematically remove the names of ineligible voters" includes a program like the one initiated by Secretary Detzner to remove non-citizens from the voter rolls less than 90 days before the 2012 elections.

### A. PLAIN MEANING

"As in all cases involving statutory construction, our starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used."  Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S. Ct. 1534, 1537 (1982) (quotation marks and

internal citations omitted).  "Courts must assume that Congress intended the ordinary meaning of the words used, and absent a clearly expressed legislative intent to the contrary, that language is generally dispositive."  Gonzalez v. McNary, 980 F.2d 1418, 1420 (11th Cir. 1993) (quotation marks omitted). Because this is a case involving statutory construction, our first task is to determine whether Secretary Detzner's program is barred under the plain meaning of the 90 Day Provision.  We believe that it is.

First, the purpose of Secretary Detzner's program was clearly to remove the names of "ineligible voters" from the Florida voter rolls.  The National Voter Registration Act (NVRA) is premised on the assumption that citizenship is one of the requirements for eligibility to vote.  See, e.g., 42 U.S.C. §§ 1973gg-3(c)(2)(C)(i), 1973gg-5(a)(6)(A)(i)(I), 1973gg-7(b)(2)(A) (requiring certain voter registration forms to state or specify "each eligibility requirement (including citizenship)" (emphasis added)).  Thus, Secretary Detzner's program to remove non-citizens was a program to remove "ineligible voters."

Second, Secretary Detzner does not deny that his program was an attempt to "systematically" remove ineligible voters from the voter rolls.  Although the statute provides no definition for the word "systematically" or "systematic," we agree that Secretary Detzner's program was a "systematic" program under any meaning of the word.  Secretary Detzner's program did not rely upon

14

individualized information or investigation to determine which names from the

voter registry to remove.  Rather, the Secretary used a mass computerized data-

matching process to compare the voter rolls with other state and federal databases,

followed by the mailing of notices.  Certainly, it is telling that the database that

Secretary Detzner used before the general election—SAVE—stands for Systematic

Alien Verification for Entitlements.

Finally, the phrase "any program" suggests that the 90 Day Provision has a

broad meaning.  Both the Supreme Court and this Court have had occasion to

consider the meaning of the word "any."  In United States v. Gonzalez, the

Supreme Court noted that "[r]ead naturally, the word 'any' has an expansive

meaning, that is 'one or some indiscriminately of whatever kind.'"  520 U.S. 1, 5,

117 S. Ct. 1032, 1035 (1997) (quoting Webster's Third New International

Dictionary 97 (1976)).  In the same way, this Court has held that when Congress

does not add any language limiting the breadth of that word, "any" means all.

Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997); Lyes v. City of

Riviera Beach, 166 F.3d 1332, 1337 (11th Cir. 1999); United States v. Castro, 837

F.2d 441, 445 (11th Cir. 1988) (concluding that "any" meant "every" and "all").

"This long history of established meaning is important, because we readily

presume that Congress knows the settled legal definition of the words it uses, and

uses them in the settled sense."  Harris v. Garner, 216 F.3d 970, 974 (11th Cir.

2000).  The fact that the provision now before us applies to "any program" strongly suggests that Congress intended the 90 Day Provision to encompass programs of any kind, including a program like Secretary Detzner's to remove non-citizens.

## B. STATUTORY CONTEXT AND PURPOSE

Thus, the plain meaning of the 90 Day Provision indicates that Secretary Detzner's actions fall under the category of "any program . . . to systematically remove the names of ineligible voters."  42 U.S.C. § 1973gg-6(c)(2)(A).  The language of the 90 Day Provision, however, is not the end of our inquiry.  "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its policy."  In re Colortex, 19 F.3d 1371, 1375 (11th Cir. 1994) (quotation marks omitted).  Here, the statutory context and policy of the NVRA further buttresses our conclusion that the plain meaning of "any program . . . to systematically remove the names of ineligible voters" was intended by Congress to include programs like Secretary Detzner's.

First, Congress expressly allowed for a number of exceptions to the 90 Day Provision, and an exception for removals of non-citizens is not one of them. Directly after the 90 Day Provision, the statute includes a limiting provision, which states:

[The 90 Day Provision] shall not be construed to preclude—(i) the removal of names from official lists of voters on a basis described in

16

paragraph (3)(A) or (B) or (4)(A) of subsection (a) of this section; or
(ii) correction of registration records pursuant to this subchapter

42 U.S.C. § 1973gg-6(c)(2)(B).  Thus the limiting provision creates an exception

in the 90 Day Provision for "correction of registration records"[3] and also directs us

to several of the exceptions in § 1973gg-6(a) (the General Removal Provision).

The General Removal Provision, which governs the removal of voters <u>at any time</u>,

states that the names of registrants may not be removed from the voter rolls except:

> (3)(A) at the request of the registrant; (B) as provided by State law, by
> reason of criminal conviction or mental incapacity . . .

> (4)(A) the death of the registrant; or (B) a change in the residence of
> the registrant . . .

<u>Id.</u> § 1973gg-6(a)(3)–(4).  Reading these two provisions together, the NVRA

expressly allows states to conduct three types of removals during the final 90 days

before a federal election.  They are removals (1) at the request of the registrant; (2)

as provided by State law, by reason of criminal conviction or mental incapacity;

and (3) upon death of the registrant.  <u>See id.</u> § 1973gg-6(c)(2)(B) (citing <u>id.</u>

§ 1973gg-6(a)(3)–(4)).

Noticeably absent from the list of exceptions to the 90 Day Provision is any

exception for removal of non-citizens.  "Where Congress explicitly enumerates

certain exceptions to a general prohibition, additional exceptions are not to be

implied, in the absence of evidence of a contrary legislative intent."  <u>Andrus v.</u>

---

[3] The Secretary has not argued that his program constitutes a "correction" of registration records.

17

Glover Constr. Co., 446 U.S. 608, 616–617, 100 S. Ct. 1905, 1910 (1980);  see also United States v. Brockamp, 519 U.S. 347, 352, 117 S. Ct. 849, 852 (1997) (observing that an "explicit listing of exceptions" indicates that "Congress did not intend courts to read other unmentioned, open-ended, 'equitable' exceptions into the statute").  The fact that Congress did not expressly include removals based on citizenship in its exhaustive list of exceptions to the 90 Day Provision is good evidence that such removals are prohibited.[4]

Finally, the stated purposes of the National Voter Registration Act further support our reading of the 90 Day Provision.  The NVRA states that its purposes are:

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

42 U.S.C. § 1973gg(b).

---

[4] Secretary Detzner suggests that the exception for removals "as provided by State law, by reason of criminal conviction or mental incapacity" could be read to authorize the removal of non-citizens from the voter rolls.  Like the District Court, we reject this interpretation.  An exception for any removal "as provided by State law" would render the 90 Day Provision completely superfluous.  See In re Griffith, 206 F.3d 1389, 1393 (11th Cir. 2000) ("[C]ourts should disfavor interpretations of statutes that render language superfluous . . . .") (quotation marks omitted).

As <u>amici</u> points out, the 90 Day Provision is designed to carefully balance these four competing purposes in the NVRA.  Brief of Current and Former Election Officials as <u>Amici Curiae</u>, 14–15.  For example, by limiting its reach to programs that "systematically" remove voters from the voter rolls, the 90 Day Provision permits removals based on individualized information at any time.  According to <u>amici</u>, individualized removals are safe to conduct at any time because this type of removal is usually based on individual correspondence or rigorous individualized inquiry, leading to a smaller chance for mistakes.

For programs that systematically remove voters, however, Congress decided to be more cautious.  At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors.  In the final days before an election, however, the calculus changes.  Eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote.  This is why the 90 Day Provision strikes a careful balance:  It permits systematic removal programs at any time <u>except</u> for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest.

## C. SECRETARY DETZNER'S INTERPRETATION

Secretary Detzner responds that interpreting the 90 Day Provision to prohibit systematic removals of non-citizens would create grave constitutional concerns.

Because the 90 Day Provision and the General Removal Provision share many of the same exceptions, <u>see</u> 42 U.S.C. § 1973gg-6(c)(2)(B), Secretary Detzner believes that the statutory text of the NVRA provides us with only two options: either non-citizens may be excluded at any time, or not at all.  The latter option, according to Secretary Detzner, would dilute the votes of citizens and trample on the rights of states to regulate the qualifications and functions of voters.  <u>See Williams v. Rhodes</u>, 393 U.S. 23, 34, 89 S. Ct. 5, 12 (1968) ("[T]he State is left with broad powers to regulate voting, which may include laws relating to the qualifications and functions of electors.").

We reject Secretary Detzner's attempts to have us decide today whether both the General Removal Provision and the 90 Day Provision allow for removals of non-citizens.  Certainly an interpretation of the General Removal Provision that prevents Florida from removing non-citizens would raise constitutional concerns regarding Congress's power to determine the qualifications of eligible voters in federal elections.  <u>Cf. Arizona v. Inter Tribal Council of Arizona, Inc.</u>, ___ U.S. ___, 133 S. Ct. 2247, 2257 (2013) ("Arizona is correct that the Elections Clause empowers Congress to regulate <u>how</u> federal elections are held, but not <u>who</u> may vote in them.").  We are not convinced, however, that the Secretary's perceived need for an equitable exception in the General Removal Provision also requires us to find the same exception in the 90 Day Provision.  None of the parties before us

20

have argued that we would reach an unconstitutional result <u>in this case</u> if we found that the 90 Day Provision prohibits systematic removals of non-citizens. Constitutional concerns would only arise in a later case which squarely presents the question of whether the General Removal Provision bars removal of non-citizens altogether.  And before we ever get that case, Congress could change the language of the General Removal Provision to assuage any constitutional concerns. With this in mind, we will confine our ruling to apply to the plain meaning of the 90 Day Provision and decline Secretary Detzner's invitation to go further.

Secretary Detzner next argues that in drafting the NVRA, Congress only contemplated the removal of people who were once entitled to vote, not the removal of people who never had eligibility (like non-citizens).  In support of this distinction, Secretary Detzner argues that non-citizens are not technically "registrants," and removing them from the voter rolls is not really a "removal" because the non-citizens on the voter rolls were never supposed to be there from the start.  He also observes that all the exceptions to the General Removal Provision relate to voters who <u>become</u> ineligible (like those who become felons or mentally incapacitated) rather than those voters who are ineligible at the time of their registration (like non-citizens).

At the outset, we are skeptical of Secretary Detzner's arguments about what Congress may or may not have contemplated when drafting the NVRA.  Our job is

to honor the broad statutory language in the 90 Day Provision, which unambiguously covers programs like Secretary Detzner's.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79, 118 S. Ct. 998, 1002 (1998) ("But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.");  Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212, 118 S. Ct. 1952, 1956 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth." (quotation marks omitted)).  We are not allowed to engage in "purpose-driven statutory interpretation at the expense of specific provisions."  Myers v. TooJay's Mgmt. Corp., 640 F.3d 1278, 1286 (11th Cir. 2011) (quotation marks omitted); see id. ("When presented with the plain text of a statute, we do not gaze at it blurry-eyed, attempting to see some hidden image formed by the broad purpose that lies behind the legislation.").

We also reject Secretary Detzner's suggestion that there is a categorical difference between (1) registrants who are ineligible to vote on account of their citizenship and (2) registrants who are ineligible to vote because of their criminal history or mental capacity.  Registrants in any of those categories could be ineligible to vote at the time of their registration or they could lose their eligibility later.  For example, while some voters lose their eligibility to vote after they

register because of a criminal conviction or mental incapacity, other voters may

have been ineligible for the same reasons at the time of their registration.  In the

same way, while Secretary Detzner is correct that a non-citizen registrant may have

been ineligible to vote at the time that he registered, a citizen could also lose his

citizenship after registering, thereby losing his eligibility to vote.  See 8 U.S.C.

§ 1481(a)(5) (describing the procedure for a United States citizen to renounce his

or her U.S. citizenship).  Thus, we do not accept Secretary Detzner's argument that

the NVRA distinguishes between the removals of registered voters who become

ineligible to vote and registrants who were never eligible in the first place.

     Finally, Secretary Detzner's limited interpretation of the 90 Day Provision

would also require us to conclude—as the District Court did—that the 90 Day

Provision only prohibits the removal of registrants who become ineligible to vote

after moving to a different state.  This is because the 90 Day Provision adopts all of

the exceptions from the General Removal Provision except for the one allowing for

removals based on a change in residence.  See 42 U.S.C. § 1973gg-6(c)(2)(B).

Such an interpretation, however, would functionally eviscerate the meaning of the

phrase "any program" in the 90 Day Provision.  See United States v. Ballinger, 395

F.3d 1218, 1236 (11th Cir. 2005) (noting that it is "a cardinal principle of statutory

construction" that "a statute ought, upon the whole, to be so construed that, if it can

be prevented, no clause, sentence, or word shall be superfluous, void, or

insignificant") (quoting <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31, 122 S. Ct. 441, 449 (2001)).  Surely when Congress wrote that the 90 Day Provision applied to "any program," it intended for the provision to apply to more than just programs aimed at voters who have moved.  If Congress wanted such a limited result, it could have said so.  <u>See</u> <u>CBS Inc. v. PrimeTime 24 Joint Venture</u>, 245 F.3d 1217, 1226 (11th Cir. 2001) ("[W]here Congress knows how to say something but chooses not to, its silence is controlling." (quotation marks omitted)).  As a result, we cannot accept Secretary Detzner's interpretation.

In closing, we emphasize that our interpretation of the 90 Day Provision does not in any way handcuff a state from using its resources to ensure that non-citizens are not listed in the voter rolls.  The 90 Day Provision by its terms only applies to programs which "systematically" remove the names of ineligible voters. As a result, the 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90-day window.  All that the 90 Day Provision prohibits is a program whose purpose is to "systematically remove the names of ineligible voters" from the voter rolls within the last 90 days before a federal election.  42 U.S.C. § 1973gg-6(c)(2)(A).

## IV.   CONCLUSION

For these reasons, we reverse the District Court's grant of judgment as a matter of law to Secretary Detzner and remand with instructions to enter an order (1) declaring that Secretary Detzner's actions here were in violation of the 90 Day Provision of the NVRA; and (2) granting such further relief as the needs and interests of justice require.

**REVERSED AND REMANDED.**

SUHRHEINRICH, Circuit Judge, dissenting**:**

I would affirm the judgment of the district court for the reasons set forth in the district court's opinion, *see Arcia v. Detzner*, 908 F. Supp. 2d 1276 (S.D. Fla. 2012), as well as the reasoning of *United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012).  I therefore respectfully dissent.